# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Louis Anthony DeNaples,  :
            Petitioner  :
                                    :  No. 719 C.D. 2017
       v.  :  Argued: December 4, 2017
                                      :
Pennsylvania Gaming Control Board,  :
            Respondent  :


BEFORE:   HONORABLE ROBERT SIMPSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE JAMES GARDNER COLINS, Senior Judge


**OPINION**
**BY JUDGE SIMPSON**                        **FILED: January 19, 2018**


Louis Anthony DeNaples (DeNaples) petitions for review of an order of the Pennsylvania Gaming Control Board (Board) denying DeNaples' January 2017 petition seeking a clarification regarding restrictions on his personal ability to transact business with Mount Airy #1, LLC (Mount Airy), a casino with a Category 2 slot machine license. DeNaples, who developed, previously owned and served as president of Mount Airy, contends the restrictions imposed on him do not apply to business entities in which he has stock or some other ownership interest or affiliation (DeNaples-Affiliated Corporations), especially after his Principal license expired. DeNaples contends the Board's written limits and restrictions imposed on him as a named individual should not apply to corporations in which he owns stock absent any language or conduct by the Board indicating such intent or purpose. Further, DeNaples asserts the Board's conduct and actions do not indicate an intent to impose limits and restrictions on entities not named or referred to in the Board's orders imposing the restrictions. Upon review, we affirm.

# I. Background

## A. Generally

DeNaples is a northeast Pennsylvania businessman and a shareholder in many privately held corporations. DeNaples developed Mount Airy, a casino resort located in Mount Pocono, Pennsylvania. On December 20, 2006, the Board initially approved Mount Airy for a Category 2 slot machine license under the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa. C.S. §§1101-1904. The same day, the Board approved DeNaples for a Principal license, as the president and sole owner of Mount Airy.

Prior to these approvals, DeNaples underwent a comprehensive investigation by the Board's Bureau of Investigations and Enforcement (BIE) and Office of Enforcement Counsel (OEC). The BIE established by Section 1517(a) of the Gaming Act, 4 Pa. C.S. §1517(a), investigates applications for licenses, permits, registrations and violations of the Gaming Act. The OEC acts as the prosecutor in all noncriminal enforcement actions before the Board. During the background investigation, DeNaples provided confidential sworn testimony before the Board.

Following the license approvals, the Board filed an adjudication in support of its decision to approve the licenses. Following an appeal by another applicant, the Supreme Court affirmed the approval of Mount Airy's license. See Pocono Manor Investors, LP v. Pa. Gaming Control Bd., 927 A.2d 209 (Pa. 2007). Therefore, in February 2007, the Board issued a Principal license to DeNaples. In July 2007, the Board issued a Category 2 slot machine license to Mount Airy. In October 2007, Mount Airy opened its doors and commenced gaming operations.

Meanwhile, in May 2007, following the Board's approval of Mount Airy's license, Dauphin County District Attorney Edward Marsico, Jr. (District Attorney) empaneled a grand jury to investigate the truthfulness of DeNaples' sworn testimony before the Board. On January 30, 2008, District Attorney filed a criminal complaint against DeNaples alleging four counts of perjury. On February 5, 2008, the Board suspended DeNaples' Principal license.

Fourteen months later, in April 2009, the Court of Common Pleas of Dauphin County entered a judgment of *nolle prosse* as to perjury charges against DeNaples following an agreement between the District Attorney and DeNaples, wherein DeNaples transferred 100% ownership of Mount Airy to other entities. In June 2009, after the charges were *nolle prossed*, the Board lifted the suspension of DeNaples' Principal license.

### B. 2009 Petition Seeking Approval of Ownership Change

In July 2009, Mount Airy filed a petition seeking Board approval of an ownership change from DeNaples to Mount Airy Holdco, LLC (Holdco). On September 23, 2009 the Board issued its "2009 Order" approving the purchase of a 100% ownership interest in Holdco by the Grantor Trust II of Lisa A. DeNaples (Lisa A. DeNaples Trust). The 2009 Order included the following conditions:

12. That the Grantor II Trust [sic] of Lisa A. DeNaples shall not invest in any entities in which Louis A. DeNaples has any ownership interest or any entity in which he has control.

13. That Louis A. DeNaples may not receive, directly or indirectly, any remuneration, cash or property

3

distributions, from [Lisa A. DeNaples Trust], [Mount Airy] or [Holdco] ….

R.R. at 17a. DeNaples labeled the written restrictions or conditions in Paragraph 13 of the 2009 Order as the "Anti-Distribution Provision." See Pet'r's Br. at 14. Essentially, DeNaples interpreted these restrictions as prohibiting him from receiving any cash or property distributions in his executive capacity as a Principal licensee.

### C. 2011 Consolidated Petitions to Modify

In May 2011, Mount Airy filed three consolidated petitions to modify the 2009 Order, one of which sought to disseminate ownership in Mount Airy and Holdco from solely the Lisa DeNaples Trust to seven trusts equally benefitting DeNaples children and grandchildren. The Board approved the dissemination of ownership in Mount Airy Holdco, LLC, as follows:

> 14.2857% shares owned by Grantor Trust II – Louis A. DeNaples, Jr.;
> 14.2857% shares owned by Grantor Trust II – Donna Dileo;
> 14.2857% shares owned by Grantor Trust II – Lisa DeNaples;
> 14.2857% shares owned by Grantor Trust II – Anne DeNaples;
> 14.2857% shares owned by Grantor Trust II – Dominica DeNaples;
> 14.2857% shares owned by the Trust f/b/o Children of Margaret Mary Glodzik; and
> 14.2857% shares owned by the Trust f/b/o Children of Nicholas DeNaples.

See Bd. Op., 5/23/17, Finding of Fact (F.F.) No. 17 n.4.

4

On June 13, 2012, the Board issued its "2012 Order" granting and denying some of the relief requested in Mount Airy's modification petitions. During the period of September 23, 2009 to June 13, 2012, DeNaples continued to function as a Principal licensee by loaning Mount Airy approximately $35,000,000 and guaranteeing debt in the amount of approximately $100,000,000. Thereafter, the Board allowed DeNaples' Principal license to expire.

The Board's 2012 Order included the following restrictions on Mount Airy's transaction of business with DeNaples, which are consistent with the restrictions in the 2009 Order:

> 4. The Children's Trusts may not invest in, or make a loan to, any entities in which Louis A. DeNaples has any ownership interest or any entity in which he has control.
>
> 5. The Children's Trusts, Mount Airy #1, LLC ('Mount Airy') or Mount Airy Holdco ('Holdco') may not provide Louis A. DeNaples, directly or indirectly, any remuneration, cash or property distributions from any of the Children's Trusts, Mount Airy or Holdco without prior Board approval.

R.R. at 22a. Notably, even though the Board allowed DeNaples' Principal license to expire, Paragraph 5 of the Board's 2012 Order included an Anti-Distribution Provision similar to that in Paragraph 13 of the 2009 Order.

In August 2013, Mount Airy again sought to modify the Anti-Distribution Provision. At oral argument on the petition in January 2014, it became clear that Mount Airy made the request on behalf of DeNaples. See R.R. at 269a-275a. After a discussion, the Board tabled Mount Airy's request to negotiate the

scope of the background investigation of DeNaples needed to lift the restrictions in the Anti-Distribution Provision; however, the parties did not reach an agreement. Consequently, in March 2014, the Board issued an order upholding the Anti-Distribution Provision until DeNaples could be properly vetted. See Joint Stip. at ¶31; R.R. at 59a.

## D. Petitions for Clarification/Reconsideration

In late June 2012, Mount Airy filed a petition for clarification/reconsideration of the 2012 Order. The petition asked the Board to declare that the 2012 Order does not prohibit Mount Airy from contracting with a business in which DeNaples, no longer a Principal licensee, has an ownership interest. Thus, Mount Airy sought to amend Condition No. 5 to include the language: "Notwithstanding the foregoing, Mount Airy may contract with companies in which Louis A. DeNaples has an ownership interest …." Bd. Op., F.F. No. 23.

However, the Board failed to place Mount Airy's clarification petition on its agenda. Therefore, after 30 days the petition was deemed denied by operation of law under Board regulations at 58 Pa. Code §494a.8, and Mount Airy was so notified.

## E. 2013 Petition to Modify

6

In August 2013, Mount Airy filed another petition seeking to modify the 2009 and 2012 Orders, again asking the Board to consider permitting Mount Airy to do business with DeNaples-Affiliated Corporations. In response, BIE and OEC objected, but indicated they would withdraw their objections if DeNaples agreed to submit to questioning to clarify and resolve the issues of whether he did or did not provide false statements during his 2006 investigation. On January 8, 2014, the Board held oral argument and tabled the modification petition for a 90-day period in order to negotiate the scope of a potential background investigation required for DeNaples. Although Mount Airy and OEC met and discussed the scope of the background investigation appropriate for DeNaples, they could not reach an agreement.

In March 2014, the Board issued an order denying Mount Airy's modification petition without prejudice. The order stated in part: "under the unique circumstances of this case, the Board will not authorize [Mount] Airy to do business with an entity affiliated with [DeNaples] given [BIE's] and [OEC's] objection to same without some level of vetting of [DeNaples]." Bd. Op., F.F. No. 32.

### F. 2015 Petition to Modify

In February 2015, DeNaples filed another petition seeking to modify the 2009 and 2012 Orders to allow him and his affiliated companies to do business with Mount Airy. On September 15, 2015, following oral argument, the Board issued an order denying DeNaples' petition based on DeNaples' failure to obtain the vote of a qualified majority of the Board.

DeNaples appealed the September 15, 2015 Order to this Court challenging the constitutionality of the qualified majority vote requirement in Section 1201(f)(1) of the Gaming Act, 4 Pa. C.S. §1201(f)(1). DeNaples also challenged the Board's interpretation of the restrictions in its 2009 Order and 2012 Order. In addition, DeNaples argued the Board erred in determining that he must be subjected to a full vetting prior to conducting business as a gaming service provider because he intends to do less than $100,000 annual business with Mount Airy. See Board regulations at 58 Pa. Code §437a.1 (a gaming service provider seeking to conduct business with a slot machine licensee shall apply to the Board for registration if the total dollar amount of the goods and services provided to one or more slot machine licensees is equal to or greater than $100,000 within a consecutive 12-month period).

## G. DeNaples I

In DeNaples v. Pennsylvania Gaming Control Board (DeNaples I), 150 A.3d 1034 (Pa. Cmwlth. 2016), an *en banc* panel of this Court, speaking through President Judge Mary Hannah Leavitt, determined, in accord with Section 1904 of the Gaming Act, 4 Pa. C.S. §1904, that Commonwealth Court did not have jurisdiction to address constitutional challenges to the Act's provisions. The Court further determined DeNaples' challenge to the Board's interpretation of its 2009 and 2012 Orders was not ripe for review because the Board never identified DeNaples or any DeNaples-Affiliated Corporations as being in violation of those orders. Similarly, the Court determined DeNaples' challenge to the scope of his vetting as a gaming service provider was not yet ripe for review because there was no final Board

8

action on the vetting issue to review. Accordingly, the Court affirmed the Board's September 15, 2015 order.

### H. 2017 Clarification Petition

In January 2017, DeNaples filed a new petition for clarification of the Board's 2009 and 2012 orders. DeNaples again argued that the Anti-Distribution Provision restricts only the distribution, directly or indirectly, of remuneration, cash or property from Mount Airy to DeNaples as a Principal licensee. Therefore, he asserts, the scope of the Anti-Distribution Provision does not encompass DeNaples-Affiliated Corporations.

DeNaples further argued the language the Board used in preceding paragraphs of the 2009 and 2012 Orders specifically references "entities in which [DeNaples] has any ownership interest or any entity in which he has control." See 2012 Order at ¶4; R.R. at 22a. However, the Anti-Distribution Provision in Paragraph 5 of the 2012 Order does not. According to DeNaples, by not repeating the language in Paragraph 4 of the 2012 Order, the Board did not intend to include that language in Paragraph 5 of the 2012 Order.

DeNaples also argued that individuals are different than corporations. As such, reference to an individual is not inclusive of that person's possessions.

In addition, DeNaples argued that the Board's conduct in permitting him to bankroll the casino as a Principal licensee, by channeling tens of millions of

dollars into Mount Airy, is inconsistent with an interpretation of the Anti-Distribution Provision as denying him status to do business with Mount Airy.

> The Board, in denying DeNaples' latest clarification petition, reasoned:

> When the ownership structure of Mount Airy is considered in conjunction with the two conditions at issue, it is clear that [DeNaples'] argument in this proceeding, that the conditions at issue only restrict him from personally receiving remuneration from the operation of the casino, must fail. Clearly, the conditions restrict him from, **directly or indirectly** (e.g. – through a corporate entity), receiving **anything** of value from **any** of the nine above named entities/trusts.

> In imposing these conditions, had the Board intended to limit the restriction to 'principal type compensation,' 'casino profits,' or 'compensation for executive services,' as [DeNaples] now argues, it would have drafted language to that effect. On the contrary, the Board sought to draft very broad conditions which limit distributions **of any kind from any entity** with any ownership in Mount Airy, thereby limiting the potential of [DeNaples] receiving distributions from the casino operation through, for example, a comingling with other non-gaming assets which could be held by one or more of the limited liability companies or trusts.

> Similarly, the conditions are also meant to limit [DeNaples] from creating a stream of revenue from Mount Airy's operations through the provision of services to the casino or any entity or trust in its own ownership stream. To argue otherwise would defy the clear language of the restrictions at issue.

Bd. Op., 5/23/17, at 15 (bolding in original).

10

The Board also rejected DeNaples' argument that corporate entities are separate and distinct from the individuals who own them. In short, the Board reasoned that the language in the restrictions stating DeNaples may not receive, directly or <u>indirectly</u>, any remuneration, cash or property distributions from Mount Airy, plainly encompasses any corporate entities in which DeNaples has an ownership interest. In support, the Board cited the statutory construction principle that the restrictions in the 2009 and 2012 orders must be construed to give effect to all of its provisions, including the prohibition on DeNaples receiving remuneration from Mount Airy indirectly through the entities in which he has an ownership interest. <u>See</u> 1 Pa. C.S. §1921.

Summarizing, the Board stated the conditions at issue ensure that DeNaples will not receive any remuneration from Mount Airy, directly or indirectly, until questions of his alleged untruthfulness during the 2005-2006 background investigation can be examined and answered. Bd. Op. at 16-17. DeNaples petitions for review.[1]

## II. Discussion
## A. Scope of Written Restrictions

---

[1] Appellate review of a Board order is limited to whether the Board's necessary findings of fact were supported by substantial evidence and whether the Board erred as a matter of law or violated a party's constitutional rights. 2 Pa. C.S. §704; <u>Keystone Redevelopment Partners, LLC v. Pa. Gaming Control Bd.</u>, 5 A.3d 448 (Pa. Cmwlth. 2010). However, appellate review over questions of law is plenary. <u>Rubino v. Pa. Gaming Control Bd.</u>, 1 A.3d 976 (Pa. Cmwlth. 2010). Further, a reviewing court must give considerable weight and deference to an agency's interpretation of its own regulations. <u>Id.</u> As such, an agency interpretation of its regulation is controlling unless clearly erroneous, inconsistent with the regulation or statute, or unreasonable. <u>Id.</u>

## 1. Argument

DeNaples contends the written limits and restrictions the Board imposed on him personally as a named individual, were not intended to apply to all corporations in which he owns stock absent any language or conduct by the Board indicating such intent or purpose.

DeNaples argues the limits and restrictions set forth in Paragraph 13 of the 2009 Order and Paragraph 5 of the 2012 Order do not apply to DeNaples-Affiliated Corporations. As noted above, Paragraph 13 of the 2009 Order provides:

> 13. That Louis A. DeNaples may not receive, directly or indirectly, any remuneration, cash or property distributions, from Grantor II Trust [sic] of Lisa A. DeNaples, Mount Airy #1 , LLC or Mount Airy Holdco, other than principal payments and interest payments from the various loans made to the Grantor II Trust [sic] of Lisa A. DeNaples.

R.R. at 17a. Paragraph 5 of the 2012 Order provides:

> 5. The Children's Trusts, Mount Airy #1, LLC (Mount Airy) or Mount Airy Holdco (Holdco) may not provide Louis A. DeNaples, directly or indirectly, any remuneration, cash or property distributions from any of the Children's Trusts, Mount Airy or Holdco without prior Board approval.

R.R. at 22a.

DeNaples asserts these provisions do not prohibit Mount Airy from doing business with a corporation in which DeNaples owns stock (DeNaples-Affiliated Corporations). Because the Board drafted these provisions, DeNaples maintains the rule of lenity, which applies in criminal cases, also applies to

12

ambiguous Commonwealth agency licensing regulations which are penal in nature. McGrath v. Bureau of Prof'l & Occupational Affairs, 146 A.3d 310 (Pa. Cmwlth. 2016), aff'd, ___ A.3d ___ (Pa., No. 5 WAP 2017, filed November 22, 2017). Pursuant to the rule of lenity, these ambiguities are to be construed against the drafting agency. Id. Therefore, a person who receives an ambiguous governmental directive, whether drafted by a legislature, court or an administrative agency, is entitled to have the ambiguity construed in his favor. Yourick v. Dep't of Transp., Bureau of Driver Licensing, 965 A.2d 341 (Pa. Cmwlth. 2009).

Although DeNaples asserts the rule of lenity applies to the Board's interpretation of the Anti-Distribution Provision, he nevertheless argues the actual text of the Anti-Distribution Provision is unambiguous in that it does not apply to DeNaples-Affiliated Corporations. Markedly, DeNaples asserts, there is not a single reference or allusion in the restrictions to any other person or entity other than himself, much less any corporations in which he has an ownership interest or other affiliation.

Further, DeNaples argues, it is hornbook law in Pennsylvania that a corporation is an entity distinct from its shareholders, even if the stock is held entirely by one person. College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200 (Pa. 1976). Therefore, the Anti-Distribution Provision, which contains neither a specific nor a generic reference to a single DeNaples-Affiliated Corporation, does not prohibit Mount Airy from transacting business with such a corporation. Thus, DeNaples argues, a conclusion that a prohibition which applies to an individual also unambiguously applies indirectly to all corporations in which

13

such an individual holds an ownership interest would stand a bedrock principle of corporate law on its head.

DeNaples further argues that the three Board members who voted against his 2017 clarification petition, whom he refers to as the Dissenters, incorrectly determined that the word "indirectly" in the Anti-Distribution Provision, expands the scope of the restrictions against DeNaples to legal entities not actually referred to, specifically or generically, in the Anti-Distribution Provision. However, DeNaples asserts, even assuming the use of the word "indirectly" with his name created an ambiguity, the rule of lenity cannot be pushed aside or disregarded. Therefore, DeNaples asserts the Board cannot have free reign to expand the use of his name to restrict all DeNaples-Affiliated Corporations from doing business with Mount Airy.

DeNaples also takes issue with the Board's language that if it intended to limit the restrictions in the Anti-Distribution Provision to the usual types of compensation a Principal license receives, it would have used precise language to that effect. In other words, DeNaples asserts, if the Board wanted the restrictions to apply to all DeNaples-Affiliated Corporations, it would have drafted language to that effect. However, the Board did not.

DeNaples further argues the Board did not draft the Anti-Distribution Provision in a context that would indicate it should be interpreted in the expansive manner that the Board determined. At the time of the 2009 Order, DeNaples was a Principal licensee, not the owner of a gaming service provider. Therefore, DeNaples

14

asserts the intent of the Anti-Distribution Provision was intended to limit his right to compensation as a Principal licensee, not to prohibit a DeNaples-Affiliated Corporation from providing Mount Airy with food, lawn care, trash service and the like at prices lower than Mount Airy could obtain elsewhere. A casino does not "distribute" money to pay for such services.

As support for his position, DeNaples cites testimony from the Board's Deputy Chief Enforcement Counsel, Nan Davenport, stating these restrictions in the Anti-Distribution Provision must stay in place until DeNaples submits an application for Principal licensee. See R.R. at 223a-224a. In other words, DeNaples argues, the focus of the Board and the OEC was on Mount Airy's ownership structure and financial future, not on what corporate entity plowed the snow.

DeNaples further argues that a DeNaples-Affiliated Corporation would not violate the specific terms of the Anti-Distribution Provision if Mount Airy did not pay for the goods and services provided, or if the DeNaples-Affiliated Corporation was unprofitable and did not pay a dividend to its shareholders.

In addition, DeNaples asserts he owns stock in many large publicly-traded companies such as Coca-Cola and Apple. Applying the Anti-Distribution Provision to such large corporations, DeNaples posits, would be absurd and unreasonable. See Eritano v. Commonwealth, 690 A.2d 705 (Pa. 1997) (statutes and regulations should not be interpreted in a manner which would lead to absurd results or unreasonable results).

15

Further, in rejecting the Board's "corporate veil" rationale in its decision, DeNaples argues the Board's expansive interpretation of the Anti-Distribution Provision is inconsistent with the plain language of the restriction limiting the restrictions to himself, not DeNaples-Affiliated Corporations. The word "indirectly," DeNaples asserts, simply means that DeNaples may not receive distributions of money funneled through an intermediary or straw man. Thus, DeNaples contends, the proposition that payment to a corporation for providing goods and services is tantamount to an indirect distribution to the corporations' shareholders is absurd. In sum, DeNaples again asserts that if the Board wanted the Anti-Distribution Provision to also apply to all DeNaples-Affiliated Corporations, it could have clearly stated so in the 2009 and 2012 Orders.

## 2. Analysis
### a. Generally

DeNaples contends the Board erred by misinterpreting the Anti-Distribution Provision in the 2009 and 2012 Orders as applying to any corporations in which he has an ownership interest rather than limiting those restrictions to DeNaples' ability to receive Principal license or executive-type compensation or remuneration, directly or indirectly, from Mount Airy or Holdco. In 2013, Mount Airy raised this precise issue, which the Board rejected. To lift the restrictions in the Anti-Distribution Provision, DeNaples must agree to submit himself to questioning about alleged false information in sworn testimony he provided to the Board during its 2006 investigation of DeNaples' application for a Principal license as owner and president of Mount Airy.

16

Thus, unlike other applicants seeking to do business with a Pennsylvania slot machine licensee, DeNaples was charged with four counts of perjury based on sworn testimony he provided during the Board's investigation of his background. Ultimately, however, the District Attorney withdrew the criminal charges pursuant to an agreement wherein DeNaples agreed to transfer 100% of his ownership in Mount Airy first to a trust benefiting his daughter Lisa A. DeNaples, and later to seven trust entities benefiting his children and grandchildren.

Most importantly here, DeNaples never explained that the perjury charges were unfounded. As such, the Board conditioned DeNaples' future rights to transact business on any level with Pennsylvania casinos, including Mount Airy, on his ability to show that the allegedly false statements made during the 2006 investigation were either misunderstood or not problematic. Consequently, the Board intentionally restricted DeNaples, and any corporate entities in which he has an ownership interest, from doing business with Mount Airy or Holdco.

To that end, we note, Mount Airy agreed in a 2012 Consent Agreement to pay a $20,000 civil penalty for entering into a contract with a DeNaples-Affiliated Corporation, North American Warhorse, Inc. (Warhorse). Pursuant to the gaming service contract, Warhorse would provide power sports equipment to Mount Airy. In the Consent Agreement, Mount Airy agreed to cease any future contractual or business relations with Warhorse during the duration of DeNaples' suspension.

**b. Current Contentions**

17

To begin, we recognize that a Commonwealth agency's interpretation of its own orders and regulations must be given considerable weight and deference. Peoples Natural Gas Co. v. Pa. Pub. Util. Comm., 567 A.2d 642 (Pa. 1989). As such, the Board's order is controlling unless clearly erroneous or inconsistent with the Board's regulations or the Gaming Act. Id.

As DeNaples points out, Paragraph 12 of the 2009 Order specifically mentions entities in which DeNaples has an ownership interest, but Paragraph 13 does not. Nevertheless, the Board asserts the Anti-Distribution Provision dates back to the February 5, 2008 suspension order which prohibited DeNaples from receiving any compensation, consideration or distribution generated by Mount Airy, and from having any contact directly or indirectly, with Mount Airy principals, key employees, licensees, permittees or registrants regarding Mount Airy business operations. See Joint Stip. at ¶12; R.R. at 55a. Moreover, the 2012 Consent Agreement was based on the February 2008 suspension order. In the Consent Agreement, Mount Airy agreed to cease any contractual or business relations with a DeNaples-Affiliated Corporation that supplied Mount Airy with power sports equipment.

In May 2012, four months after the January 2012 Consent Agreement, Mount Airy tried to lift the restrictions imposed by the Anti-Distribution Provision in the 2009 Order. Rather than granting the relief requested, the Board repeated it.

In August 2013, Mount Airy again sought to modify the Anti-Distribution Provision. At oral argument on the petition in January 2014, it became

18

clear that Mount Airy made the request on behalf of DeNaples. See R.R. at 269a-275a. After a discussion, the Board tabled Mount Airy's request to negotiate the scope of the background investigation of DeNaples needed to lift the restrictions; however, the parties did not reach an agreement. Consequently, in March 2014, the Board issued an order upholding the restrictions until DeNaples could be properly vetted. See Joint Stip. at ¶31; R.R. at 59a.

In February 2015, DeNaples filed a petition to modify the Anti-Distribution Provision, which the Board again denied, resulting in DeNaples' unsuccessful appeal in DeNaples I.

Given the history of Mount Airy's and DeNaples' unsuccessful challenges to the Anti-Distribution Provision in the 2009 and 2012 Orders, we find that DeNaples was obviously aware that the Board interpreted the Anti-Distribution Provision to prohibit Mount Airy from doing any business with not only DeNaples himself at the Principal level, but also with any DeNaples-Affiliated Corporations as gaming service providers. In fact, since the Consent Agreement, Mount Airy has not done any business with any DeNaples-Affiliated Corporations.

Therefore, we discern no error or abuse of discretion by the Board in interpreting the Anti-Distribution Provision as prohibiting Mount Airy from doing any business not only with DeNaples himself, but with any DeNaples-Affiliated Corporation, on any level. As discussed above, the Board's interpretation of its own orders is entitled to great deference and may not be disturbed unless clearly erroneous. Peoples Natural Gas; Rubino. The Anti-Distribution Provision specifically prohibits DeNaples from receiving, directly or indirectly, any

19

remunerations, cash or property distributions from Mount Airy or Holdco. The 2009 and 2012 Orders also prohibit Mount Airy from investing in any DeNaples-Affiliated Corporations. Together, these provisions prohibit DeNaples, either personally, or through businesses in which he has an ownership interest, from affecting Mount Airy operations.

To adopt DeNaples' narrow interpretation of the Anti-Distribution Provision as applying only to Principal licensee-type compensation, would permit Mount Airy to engage in business indirectly with DeNaples through his businesses as gaming service providers, which would render the Anti-Distribution Provision essentially meaningless in its current context.

We also agree with the Board that its "expansive" interpretation of the Anti-Distribution Provision is consistent with its regulations at 58 Pa. Code §437a.1(i), which provides (with emphasis added):

> <u>A gaming service provider of a slot machine applicant</u> or licensee whose compensation does not exceed the monetary thresholds contained in this section or who is otherwise not required to be registered or certified under subsection (d) or (g) <u>may be required to be registered or certified if the board determines that the registration or certification is necessary to protect the integrity of gaming</u>.

In imposing the Anti-Distribution Provision in the 2009 Order and again in the 2012 Order, the Board invoked its authority to prohibit DeNaples-Affiliated Corporations from doing business with Mount Airy, and vice versa, until the Board is afforded an opportunity to adequately question DeNaples regarding his alleged false statements during the 2006 investigation. As discussed above,

20

DeNaples has yet to explain his alleged perjury to the Board. Thus, before allowing DeNaples-Affiliated Corporations to do business with Mount Airy as game service providers, the Board is authorized to vet a gaming service provider if deemed necessary to protect the integrity of the gaming industry in Pennsylvania. 58 Pa. Code §437a.1(i).

Further, we reject DeNaples' argument that the Anti-Distribution Provision is penal in nature and thus subject to the rule of lenity, which requires that statutory ambiguities be interpreted against the state and in favor of the defendant. The purpose of the Anti-Distribution Provision is to protect the integrity of gaming, not to punish DeNaples for a crime. DeNaples may remove the Anti-Distribution Provision by answering questions regarding the alleged false statements he made to the Board during the 2006 investigation and showing that the allegedly false statements were either misunderstood or not problematic in his license application. However, DeNaples has not done so.

Summarizing, in light of all the surrounding facts and circumstances in this case, we discern no error or abuse of discretion in the Board's interpretation of the Anti-Distribution Provision. This is consistent with the Board's interest in safeguarding the integrity of the Pennsylvania gaming industry by prohibiting DeNaples' participation at any level, including that of a gaming service provider, until he is vetted regarding his alleged perjury during the Board's 2006 licensing investigation. See 4 Pa. C.S. §1317.2(a) (the Board shall develop a classification system governing the certification, registration and regulation of gaming service providers and individuals and entities associated with them); 4 Pa. C.S. §1317.2(d)

21

(the Board may require employees of a gaming service provider to obtain a permit or other authorization <u>if, after an analysis of duties, responsibilities and functions, the Board determines that a permit or other authorization is necessary to protect the integrity of gaming</u>); 4 Pa. Code §437a.1(i) (gaming service provider of a slot machine licensee may be required to be registered or certified <u>if the Board determines the registration or certification is necessary to protect the integrity of gaming</u>).

## B. Board's Conduct and Actions

### 1. Argument

DeNaples also contends the Board's conduct and actions do not indicate an intent to impose the restrictions in the Anti-Distribution Provision on business transactions with all DeNaples-Affiliated Corporations. Again, DeNaples argues the Anti-Distribution Provision was intended to apply only to his activities as a Principal licensee from September 2009 through June 2012. Pursuant to Section 1103 of the Gaming Act, a "Principal" incudes a lender. 4 Pa. C.S. §1103. During this time, DeNaples acted as a financier and guarantor of Mount Airy from 2009, and infused Mount Airy with approximately $35,000,000 in loans and $100,000,000 in debt guarantees.

However, after June 13, 2012, DeNaples no longer functioned as a Principal licensee, and the Board allowed his license to expire. The Board also permitted DeNaples to withdraw his Principal license application without prejudice. By allowing the withdrawal of his Principal license application without prejudice, DeNaples argues the Board acknowledged there were no outstanding issues with his

suitability for his licensure. <u>See</u> 58 Pa Code §§423a.5; 423a.7. As such, DeNaples maintains the Board granted him a clean slate.

Therefore, DeNaples argues, it is absurd to prohibit Mount Airy from transacting business with a DeNaples-Affiliated Corporation functioning as a low level gaming service provider after June 13, 2012. To that end, DeNaples asserts, if a gaming service provider transacts less than $100,000 of business with a slot machine licensee within a 12-month rolling period, the provider does not need to apply to the Board for registration. 58 Pa. Code §437a.1. Thus, DeNaples posits, if he owned 50% of a corporation that provided $90,000 of goods and services to Mount Airy within a 12-month period, neither DeNaples nor the corporation would need to file any applications to the Board or undergo even the most cursory of investigations.

In particular, DeNaples argues, under the Board's interpretation of the Anti-Distribution Provision, DeNaples was permitted as a Principal licensee to funnel tens of millions of dollars to Mount Airy from 2009 through 2012 to sustain its operations, but at the same time was prohibited from engaging in low level gaming service provider activity, which requires no license and perhaps no investigation. Similarly, by granting DeNaples a clean slate to apply for a Principal license, the highest level of licensure, it would make no sense to prohibit him from engaging in activities as a low level gaming service provider.

A more sensible interpretation of the Anti-Distribution Provision, DeNaples argues, would be to prohibit Mount Airy from providing him with

23

Principal-type compensation until he applies for and receives a new Principal license. However, the Anti-Distribution Provision should not be interpreted as prohibiting Mount Airy transacting business with a DeNaples-Affiliated Corporation functioning as a low level gaming service provider.

## 2. Analysis

As discussed above, the Anti-Distribution Provision is consistent with regulations at 58 Pa. Code §437a.1(i).

In imposing the Anti-Distribution Provision in the 2009 Order, and again in the 2012 Order, the Board invoked its statutory authority in 4 Pa. C.S. §1317.2(a) and (d) to prohibit any DeNaples-Affiliated Corporations from doing business with Mount Airy as a gaming service provider until they receive the necessary authorization. Such authorization may be dependent on DeNaples' willingness to submit to an analysis by the Board as to whether he would be a threat to the integrity of the gaming industry in Pennsylvania in light of his refusal to answer questions regarding his alleged false statements to the Board during the 2006 investigation. Therefore, until DeNaples submits to such vetting, the Anti-Distribution Provision is consistent with the Gaming Act and its regulations.

Further, although DeNaples contends the Board granted him a clean slate under its regulations by allowing him to withdraw his application for a Principal license without prejudice, the Board is entitled to deference in the interpretation of its own regulations. Peoples Natural Gas; Rubino. As the Board points out, DeNaples' Principal license was never fully restored, and DeNaples never satisfied

24

the Board's inquiry as to whether he lied to the Board under oath during the 2006 investigation. Although DeNaples avoided criminal prosecution for perjury, he did so by agreeing to relinquish any ownership or control in Mount Airy. Consequently, we will not disturb the Board's interpretation of 58 Pa. Code §437a.1(i).

For these reasons, we affirm the Board's order.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Louis Anthony DeNaples,      :
            Petitioner      :
                         :    No. 719 C.D. 2017
        v.                :
                         :
Pennsylvania Gaming Control Board,    :
            Respondent    :

## **O R D E R**

       **AND NOW**, this 19th day of January , 2018, for the reasons stated in the foregoing opinion, the order of the Pennsylvania Gaming Control Board is **AFFIRMED**.

 

                        _____

                        ROBERT SIMPSON, Judge